UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN LUCKETT, ) | |
|       Plaintiff, ) | |
| ) | Case No. 14-cv-6089 |
| ) | |
| v. ) | Honorable Judge Thomas M. Durkin |
| ) | |
| THOMAS DART, ) | |
|       Defendant. ) | |

**DEFENDANT THOMAS DART'S LOCAL RULE 56.1(a)
STATEMENT OF UNDISPUTED MATERIAL FACTS IN
<u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

    Defendant Thomas Dart, by his attorney, Anita Alvarez, Cook County State's Attorney, through her assistant, Nile Miller, Assistant State's Attorney, submits this statement of undisputed material facts as to which there is no genuine issue and that entitles Defendant to judgment as a matter of law. Defendant submits these facts as undisputed for purposes of Defendant's motion for summary judgment only.[1]

    1.    Plaintiff John Luckett ("Plaintiff") has been employed by Defendant Cook County Sheriff ("Defendant" or Sheriff's Office") as a correctional officer in the jails at the Cook County Department of Corrections ("CCDOC") since February 7, 1994. (Pl. Dep. 24:10-22; Compl. ¶7)

---

[1] "Pl. Dep." refers to the deposition of Plaintiff John Luckett, attached hereto as <u>Exhibit A</u>. "Nolan Dep." refers to the deposition of Rosemarie Nolan, attached hereto as <u>Exhibit B</u>. "Rivero-Canchola Dep." refers to the deposition of Sabrina Rivero-Canchola, attached hereto as <u>Exhibit C</u>. "Hartman Decl." refers to the declaration of David Hartman, attached hereto as <u>Exhibit D</u>. "Nolan Decl." refers to the declaration of Rosemarie Nolan, attached hereto as <u>Exhibit E</u>. "Rivero-Canchola Decl." refers to the declaration of Sabrina Rivero-Canchola, attached hereto as <u>Exhibit F</u>. "Zalas Decl." refers to the declaration of Deanna Zalas, attached hereto as <u>Exhibit G</u>. "Compl." refers to Plaintiff's Revised Amended Complaint [Dkt. #9], attached hereto as <u>Exhibit H</u>. "Pl.'s Resp. to Interrogatories" refers to Plaintiff's Answers to Interrogatories, attached hereto as <u>Exhibit I</u>.

2.      On September 20, 2012, Plaintiff was attacked by an inmate and was on duty injury leave from September 21, 2012 to February 26, 2014. (Compl. ¶¶12-13; Pl. Dep. 89:12-22)

3.      Plaintiff filed a worker's compensation claim regarding his September 20, 2012 injury. (Pl. Dep. 55:5-7)

4.      Cook County Department of Risk Management, not the Cook County Sheriff, is responsible for administration and payment of Workers' Compensation benefits for injuries or illness sustained during the course and scope of employment with Cook County Sheriff; determining compensability of each claim in compliance with the Illinois Workers' Compensation Act; approving medical, indemnity, and other payments; contesting non-compensable claims and negotiating settlements; and maintaining a data system for monitoring and controlling Workers' Compensation claims. (Zalas Decl. ¶3)

5.      The Cook County Sheriff's Office does not make decisions about whether an employee's medical bill should be covered pursuant to a worker's compensation claim or whether an employee is entitled to workers compensation indemnity payments; such decisions were made by Cook County Department of Risk Management. (Zalas Decl. ¶3; Rivero-Canchola Decl. ¶¶11-12)

6.      The Department of Risk Management receives and reviews medical information provided by the employee or an Independent Medical Examination to inform when an employee is released to return to work by a physician. (Zalas Decl. ¶5)

7.      The Cook County Sheriff's Office did not make any decisions regarding Plaintiff's medical treatment payments, release to return to work, or workers compensation indemnity payments. (Rivero-Canchola Decl. ¶13)

8. The Sheriff's Office does not control, manage, or employ the Cook County Department of Risk Management. (Nolan Decl. ¶7; Rivero-Canchola Decl. ¶10; Zalas Decl. ¶4)

9. On November 28, 2012, Plaintiff's neurologist Dr. Douglas Anderson, wrote a letter stating that Plaintiff should not return to work due to his "worsening symptoms." (Pl. Dep. 95:21-96:6)

10. In February 2013, Cook County Department of Risk Management required Plaintiff to get an Independent Medical Examination with a neurologist, Dr. Karen Levin, who, along with Plaintiff's own neurologist Michael Schneck, concluded that from a neurologic point of view, Plaintiff had reached maximum medical improvement and can work full duty. (Zalas Decl. ¶6; Zalas Decl. Ex. A; Pl. Dep. 98:16-23, 103:5-8)

11. There is nothing wrong with Plaintiff neurologically or physically. (Pl. Dep. 104:15-18)

12. Cook County Risk Management retained an Independent Medical Examiner, Dr. David Hartman, to test Plaintiff's neuropsychological and psychological abilities on October 21, 2013. (Pl. Dep. 108:2-12; Hartman Decl. ¶¶7-8; Hartman Ex. B; Zalas Decl. ¶¶8-10)

13. Dr. Hartman, who was a board-certified neuropsychologist, concluded that Plaintiff's claims related to PTSD was not credible, stating in his report:

> Mr. Luckett's claims related to posttraumatic stress disorder are also not credible. Symptoms are by self-report only and face valid questionnaires related to depression and anxiety are invalid in the context of current exaggerated symptom self-report and Mr. Luckett's odd interview behavior where he attempted to simulate symptoms. It is insufficient to simply claim that one has PTSD symptoms because in the context of litigation "PTSD is an easy disorder to fake. The diagnosis is based almost entirely on the individual's subjective report of symptoms which are very difficult to verify independently…."

(Hartman Decl. Ex. B, at 18-19)

14. Dr. Hartman concluded that the diagnosis of PTSD by Plaintiff's neuropsychologist Christopher Randolph, failed to use symptom inventory or personality inventory that would have been sensitive to malingering, stating in his report:

> Dr. Randolph relied on Mr. Luckett's self-report and questionnaires without the sensitivity to rule out exaggeration. As such, Dr. Randolph's diagnosis of PTSD is considered non-dispositive and below standard of care in its failure to objectively assess for the possibility of symptom endorsement exaggeration.

(Hartman Decl. Ex. B, at 16, 18-19)

15. Dr. Hartman concluded that Plaintiff had reached maximum medical improvement from the injuries sustained during his employment with the Cook County Sheriff. (Zalas Decl. ¶8; Hartman Decl. Ex. B, at 20)

16. After Dr. Hartman's examination, the Department of Risk Management determined that Plaintiff was no longer eligible for workers compensation indemnity payments as Plaintiff was released to return to work full duty. (Zalas Decl. ¶9)

17. Plaintiff claims that he was denied treatment for his PTSD. (Pl. Dep. 53:16-23) Plaintiff requested treatment for Plaintiff's PTSD from Cook County Department of Risk Management through Plaintiff's worker's compensation case. (Pl. Dep. 55:5-10, 56:17-57:10)

18. Plaintiff never requested treatment for his PTSD to the Sheriff's Office or talked to anyone at the Sheriff's Office or Department of Risk Management about his request for treatment being denied. (Pl. Dep. 56:5-7, 57:21-24)

19. After the Department of Risk Management denied Plaintiff's request for treatment, Plaintiff received treatment through his group health insurance through the Sheriff's Office group insurance plan. (Pl. Dep. 54:16-21)

20. Plaintiff received approximately $60,000 in indemnity payments and approximately $28,000 for medical treatment related to his worker's compensation claim as a result of his September 20, 2012 duty injury. (Pl. Dep. 93:10-13; Zalas Decl. ¶11)

21. The Department of Risk Management did not base any decisions regarding Plaintiff's workers compensation claim management on his race or disability, if any. (Zalas Decl. ¶12)

22. Around the end of February 2014, Deputy Chief of Human Resources for the Cook County Sheriff's Office Rosemarie Nolan called to inform Plaintiff to return to work full duty because Dr. Hartman released Plaintiff to return to work full duty. (Pl. Dep. 39:10-17, 111:11-19; Nolan Dep. 6:22-24)

23. During that call, Plaintiff requested to not go right back into full-duty at the jail, and Nolan informed Plaintiff that he would have to apply for it and submit doctors' notes to support his request. (Pl. Dep. 40:11-41:19, 43:11-16, 51:13-52:2) Plaintiff never spoke with Nolan again after the call. (Pl. Dep. 48:12-20)

24. Around February 20, 2014, Plaintiff received a letter from Nolan stating:

> The Sheriff's Personnel Office received notification on February 18, 2014 from the Cook County Department of Risk Management, Worker's Compensation Division that your Independent Medical Evaluation indicates an ability to return to work at Fully Duty. Please report [sic] the Sheriff's Personnel Office no later than Wednesday February 26, 2014.

(Pl. Dep. 112:18-20; Pl. Dep. Ex. 21)

25. Plaintiff returned to work as correctional officer at the end of February 2014 at Division XI, which is a medium security inmate living unit. (Pl. Dep. 26:22-23, 34:7-8, 39:8-11)

26. At his deposition, Plaintiff testified that he has been performing his duties as a correctional officer to the best of his abilities while he was at the Sheriff's Office, that he is good at his job, and that he is able to perform his duties as correctional officer well. (Pl. Dep. 29:8-17)

27. At his deposition, when asked, "What job duties and responsibilities are you able to perform with your disability," Plaintiff admitted "If I have to, I can perform all of them if I have to. But I am uncomfortable." (Pl. Dep. 63:17-22)

28. When asked "What can you perform comfortably?," Plaintiff responded "I don't want to be around the inmates, not a bunch of them by myself." (Pl. Dep. 63:23-64:1)

29. When asked "What job duties and responsibilities are you unable to perform because of your disability? Having inmate contact?" Plaintiff responded, "I mean I had to do it -- I did it." (Pl. Dep. 64:14-17)

30. When asked "Other than that is there any other duties and responsibilities that you're unable to perform because of your disability?" Plaintiff testified "I mean, I'm able to perform them because they forced me to. I have to adapt." (Pl. Dep. 64:21-65:1)

31. After speaking with Nolan in February 2014, the next time Plaintiff made any kind of request was in June 2014 because he "didn't think [he] could do anything else until [he] started talking to people." (Pl. Dep. 41:13-14, 48:18-49:1)

32. The first time Plaintiff made any request in writing was in June 2014; prior to June 2014, Plaintiff only made a verbal request for accommodation. (Pl. Dep. 49:2-11)

33. When asked, "Did you keep a copy of all of your written requests for accommodations to the Sheriff's Office," Plaintiff responded "Yes." (Pl. Dep. 14:15-18)

34. On June 18, 2014, Plaintiff received an email from the Sheriff's Office with the ADA accommodation form for Plaintiff to fill out. (Pl. Dep. 128:7-9; Pl. Dep. Ex. 28)

6

35.     In June 19, 2014, Plaintiff faxed a memorandum to Rosemarie Nolan and Sean Lynch requesting as follows:

> I am requesting an American with Disabilities Act (ADA) assignment or something low level inmate contact. Based on my current disability which is "Post-Trumatic[sic] Stress Disorder", (PTSD). The CCDOC denied my psychiatric treatment for this disability. I am currently seeking my own treatment for my condition which consist of depression, anxiety and sleepless nights. I am asking that you please consider this request and respond to me as soon as possible. Also my condition was caused by a duty injury which occurred on 20 Sept. 2012. Any kind of transitional assignment would be greatly appreciated.

(Pl. Dep. 130:22-24; Pl. Dep. Ex. 31, at 1)

36.     Plaintiff also faxed an Americans with Disabilities Act (ADA) Reasonable Accommodation Request Form, stating as follows:

> **What, if any, job function(s) are you having a difficulty performing?** Working around too many inmates. I am suffering from Post Traumatic Stress Disorder which was caused by a duty injury that occurred on 10 Sept. 2012.
>
> **Please describe any limitations resulting from your condition that interfere with your ability to perform the functions of your job:** Flashbacks of the duty injury that occurred on 10 Sept. 2012, anxiety, depression, fatigue.
>
> **Please describe the accommodation(s) you believe are needed to perform the essential functions of your job?** Any assignment with minimum low inmate contact to none.

(Pl. Dep. 132:5-11; Pl. Dep. Ex. 31, at 2-3)

37.     After Plaintiff faxed the form, the Sheriff's Office informed Plaintiff that Sabrina Rivero-Canchola, the Employee Relations Specialist, is reviewing his request. (Pl. Dep. 128:17-24; Pl. Dep. Ex. 29)

38.     On June 19, 2014, Rivero-Canchola sent Plaintiff a website link for the Sheriff's Employment Action Plan regarding the ADA Accommodation Procedure. (Pl. Dep. 129:9-13; Pl. Dep. Ex. 30; Rivero-Canchola Dep. 17:9-10)

39.     On June 20, 2014, Rivero-Canchola sent an email to Plaintiff stating:

7

> In order to evaluate your eligibility for ADA accommodations we will need you to provide us with a letter from your doctor stating your diagnoses as well as your duty limitations. Please send that letter to me at 3026 S. California, Building 2, Room 109. You may also hand deliver the letter. Please do not email or fax the letter because it contains confidential personal information. Once I've received your doctor's letter, we can begin to evaluate what accommodations we can reasonably provide. I will also mail you the information contained in this email.

(Pl. Dep. 132:17-19; Pl. Dep. Ex. 32)

40. On June 24, 2014, Rivero-Canchola sent a formal memorandum to Plaintiff that stated as follows:

> In order to evaluate your eligibility for ADA accommodations we will need you to provide us with a letter from your doctor stating your duty limitations and their expected duration. Please send that letter to me at 3062 S. California Building 2, Room 109. You may also hand deliver the letter. Please do not email or fax the letter because it contains confidential personal information. Once I've received your doctor's letter, we can begin to evaluate what accommodations we can reasonably provide to you.

(Pl. Dep. 134:5-7; Pl. Dep. Ex. 34)

41. When asked "How many times did you meet Ms. Canchola?" Plaintiff responded "Once" when he was dropping of his doctor's letter. (Pl. Dep. 50:9-13)

42. Plaintiff hand delivered personally to Rivero-Canchola a letter dated June 24, 2014 from his primary care physician, Dr. Milton Legrand, which stated:

> To whom it may concern: Mr. John Luckett has been a patient of mine for many years. He has post traumatic stress disorder and he should have little to no contact with inmates due to his post traumatic stress disorder. If you have any questions, please do not hesitate to call our offices.

(Pl. Dep. 52:21-53:15, 133:12-20)

43. Dr. Legrand is an internal medicine doctor, not a psychologist, psychiatrist, therapist, or mental health specialist. (Pl. Dep. 105:1-12)

44. Dr. Legrand's letter was deficient because the letter was from an internist, not a doctor qualified to diagnose PTSD, and Rivero-Canchola was unable to tell from the letter

8

whether or not Plaintiff was qualified under the ADA because the letter did not indicate what Plaintiff's duty limitations were and how his diagnosis substantially affected his life activities. (Rivero-Canchola Dep. 19:10-20:1, 20:18-22, 21:8-11, 25:7-14)

45. On June 27, 2014, Rivero-Canchola began to inquire into reassignment of Plaintiff to the visitor center as an ADA accommodation to get the process started because reassignment within the CCDOC could be a lengthy process including making sure the elements of the request is there and involving multiple parties including the Executive Director's Office and the union. (Rivero-Canchola Dep. 45:13-46:5; Rivero-Canchola Dep. Ex. D-E)

46. Then, Rivero-Canchola learned about the Independent Medical Examination by neuropsychologist Dr. David Hartman, who concluded that Plaintiff was malingering symptoms of PTSD based on tests that were performed, and realized that the IME conflicted with Dr. Legrand's letter. (Rivero-Canchola Dep. 23:11-16, 36:15-17)

47. The IME raised questions as to whether or not Plaintiff actually suffered from PTSD. (Rivero-Canchola Dep. 75:19-23)

48. On July 2, 2014, Rivero-Canchola sent an email to Plaintiff stating as follows:

Hello Officer Luckett, Please obtain a new letter from your doctor stating that he is releasing you back to work, but with the restriction of limited to no inmate contact based on your diagnosis of PTSD. Also have him note whether the restriction is permanent or temporary. That's all I need him to specify. Thank you, Sabrina Rivero-Canchola

(Pl. Dep. 135:24-136:8; Pl. Dep. Ex. 36)

49. The Sheriff's Office requires a medical note authorizing the employee to work when an employee is making a request for ADA accommodation even when the employee is working at the time because the employee has indicated they are unable to perform their job

9

function and the employee's condition may have changed at the time they are requesting an ADA accommodation. (Nolan Dep. 47:14-48:18, 50:2-22)

50. An employee requesting ADA accommodation must provide a comprehensive diagnostic statement, which must include that the employee could return to work, whether or not the restrictions were temporary or permanent, if there were any restrictions or limitations that the employee had based on their medical condition and whether or not the condition was permanent under the Americans with Disabilities Act. (Nolan Dep. 30:23-31:14; Rivero-Canchola Decl. ¶8)

51. Under the applicable collective bargaining agreement, to be eligible for a transitional work assignment, an employee must provide a medical prognosis from their treating physician that indicates that the officer can return to work. (Pl. Dep. Ex. 3 at §8.11)

52. A transitional work assignment cannot exceed six (6) months, and the CBA requires a medical prognosis from the treating physician that indicates that the officer is expected to return to full-duty during their prescribed time in the transitional work plan. (Pl. Dep. Ex. 3 at §8.11)

53. Plaintiff always hand delivered his doctor's note to Rivero-Canchola personally, and he only met Rivero-Canchola one time. (Pl. Dep. 50:9-13, 52:21-53:15)

54. Rivero-Canchola did not receive any medical documents from Plaintiff other than the letter dated June 24, 2014 from Dr. Legrand, and Rivero-Canchola did not hear from Plaintiff after his email from July 2, 2014. (Pl. Dep. 50:9-13, 52:21-53:15; Rivero-Canchola Dep. 26:2-4, 65:4-6; Rivero-Canchola Dep. Ex. J)

55. A note from Dr. Li-Jun Huang dated July 1, 2014 states, "Due to Plaintiff's traumatic experience at work, I do recommend that patient should work at a different position (Work Transitional Assignment)." (Pl. Dep. 135:5-15; Pl. Dep. Ex. 35) Rivero-Canchola did

10

not receive the note from Dr. Huang. (Pl. Dep. 50:9-13, 52:21-53:15; Rivero-Canchola Dep. 26:2-4, 65:4-6)

56. A note from Dr. Michael Schneck dated July 7, 2014 states,

> Dear Ms. Canchola: John D. Luckett is a 49-year old man who is under my care at Loyola University Medical Center Department of Neurology & Neurosurgery. Mr. Luckett is being seen for post traumatic stress disorder, post concussive syndrome and has a history of Moya Moya syndrome and also status post stroke. I recommend that Mr. Luckett have little to no contact with inmates, due to the noted neurological problems as stated above. He should be in transitional work assignment for an undetermined length of time. He is seen in my outpatient clinic on a regular basis. This is a result of a reported incident which occurred on September 20, 2012 at the Cook County Department of Corrections. If you have further questions, please do not hesitate to contact me.

(Pl. Dep. Ex. 38) Rivero-Canchola did not receive the note from Dr. Schneck. (Pl. Dep. 50:9-13, 52:21-53:15; Rivero-Canchola Dep. 26:2-4, 65:4-6)

57. Plaintiff's request for accommodation was denied because Plaintiff failed to submit the appropriate documentation to allow Rivero-Canchola to make an informed decision. (Rivero-Canchola Dep. 61:24-62:3)

58. On July 23, 2014, Rivero-Canchola sent a letter to Plaintiff stating that the Sheriff's Office was unable to accommodate Plaintiff because he "did not provide the requested medical documentation to make an informed determination" but that he had the right to appeal the decision by completing a Reasonable Accommodation Appeal Form and that he may qualify for a Hardship Transfer. (Rivero-Canchola Dep. Ex. K)

59. Rivero-Canchola did not base any decisions regarding Plaintiff's request for accommodation on his race or any disability. (Rivero-Canchola Decl. ¶15)

60. Plaintiff never appealed the denial of his request for accommodation. (Pl. Dep. 142:11-13)

61. Plaintiff claimed that he faxed a request for hardship transfer to his union but Plaintiff did not know what the union did with the request. (Pl. Dep. 140:14-22, 141:21-23)

62. Plaintiff claims that he was discriminated against when he was forced to return to work even though his treating physician would not release him to work. (Compl. ¶¶21, 27)

63. Plaintiff admitted that he has no personal knowledge about how the decision is made to return someone to work at the Sheriff's Office, how the decision is made to grant or deny an employee Transitional Work Assignment or ADA accommodations, or how the decision is made to grant or deny treatment for duty injury is made at the County or the Sheriff's Office. (Pl. Dep. 37:18-38:24)

64. Plaintiff testified that he believes that people were treated better than him at the Sheriff's Office because it is very political and "it's who you know." (Pl. Dep. 65:21-66:2)

65. Plaintiff only identified two individuals who were allegedly treated better than him because they were assigned to Division XIII, specifically Officer A and Officer B.[2] (Pl. Dep. 66:5-9, 68:12-16; 75:8-11)

66. Officers A and B provided comprehensive diagnostic statements from their physicians stating that they had permanent restrictions pursuant to the ADA, that they can return to work, and their specific restrictions such as how long they can stand and how far they can walk. (Rivero-Canchola Decl. ¶5; Nolan Decl. ¶4)

67. Officers A and B were given accommodations that were necessary for them to perform the essential functions of their jobs as correctional officers. (Rivero-Canchola Decl. ¶6; Nolan Decl. ¶5)

---

[2] Defendant files a motion for leave to file under seal exhibits revealing Officers A's and B's identities and confidential medical information.

68. Plaintiff did not identify any non-disabled individual who was treated better than him during his deposition or in his answers to interrogatories. (Pl.'s Resp. to Interrogatories #12)

69. Rivero-Canchola processed a total of 18 ADA accommodation requests and approved 15 out of the 18 requests. (Rivero-Canchola Decl. ¶¶3-4) The racial breakdown of individuals who received accommodations is as follows: 7 Black, 7 White, and 1 Asian. (Rivero-Canchola Decl. ¶4)

70. The 15 individuals who Rivero-Canchola approved accommodations for provided comprehensive diagnostic statements from doctors stating that they had permanent restrictions pursuant to the ADA, that they are released to return to work, and their specific restrictions. (Rivero-Canchola Decl. ¶5)

71. The 15 individuals who Rivero-Canchola approved accommodations for were given accommodations that were necessary for them to perform the essential functions of their jobs. (Rivero-Canchola Decl. ¶6)

72. Rivero-Canchola denied 3 out of the 18 requests for ADA accommodations that she processed. (Rivero-Canchola Decl. ¶9) The racial breakdown of the individuals who were denied accommodations is 1 Black (Plaintiff), 1 White, and 1 Hispanic. (Rivero-Canchola Decl. ¶9)

73. Plaintiff never spoke directly with Sheriff Dart. (Pl. Dep. 31:20-22)

74. Plaintiff has been cleared from Moyamoya in about March 2012. (Pl. Dep. 100:24-101:2)

75. When asked "What are the symptoms that you experience as a result of your disabilities," Plaintiff responded nightmares, irritability, depression, anxiety, and being withdrawn. (Pl. Dep. 61:7-13)

76. To Plaintiff's understanding, the reasonable accommodation that was denied was a transitional work assignment of limited-to-no inmate contact. (Pl. Dep. 125:14-18)

Date: March 24, 2016 Respectfully submitted,

        ANITA ALVAREZ
        State's Attorney of Cook County

By: */s/ Nile Miller*
     Assistant State's Attorney
     Richard J. Daley Center
     50 West Washington, Suite 500
     Chicago, Illinois 60602
     (312) 603-4186

**CERTIFICATE OF SERVICE**

      I, Nile Miller, Assistant State's Attorney, hereby certify that the attached *Defendant Thomas Dart's Local Rule 56.1(a) Statement Of Undisputed Material Facts In Support Of Motion For Summary Judgment* was served *via* ECF on March 24, 2016 on the following:

Jemelle Cunningham
LAD Law Group, P.C.
Attorneys For Plaintiff
203 N. LaSalle St.
Suite 2100
Chicago, Illinois 60601

                                                              */s/ Nile Miller*