## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN LUCKETT, | ) | |
| | ) | |
| PLAINTIFF, | ) | 14-CV-6089 |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| | ) | |
| THOMAS DART, | ) | |
| | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Luckett has brought suit against his employer, the Cook County Sheriff's Office ("CCSO").[1] The complaint alleges violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Before the Court is the CCSO's motion for summary judgment. For the reasons that follow, the CCSO's motion is granted as to Counts I and III (ADA and Title VII disparate treatment claims) and denied as to Count II (ADA failure to accommodate claim).

### STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[1] The named defendant, Thomas Dart, is the Sheriff of Cook County, and is being sued in his official capacity. The real party in interest when a state employee is sued in his official capacity is the entity itself, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), and so the Court will refer in this opinion to the CCSO in place of Thomas Dart.

322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## BACKGROUND

The following facts are supported by evidence in the record and are undisputed unless otherwise indicated. Luckett has been employed by the CCSO as a correctional officer in the jails at the Cook County Department of Corrections ("CCDOC") since February 7, 1994. The CCDOC is divided into specific areas and divisions. Those areas include Divisions 1 through 11, the Visitor Information Center, External Operations, Transportation, Sanitation, Emergency Response Team, and clothing. When Luckett first began working at the CCDOC, he was assigned to Division 8. This assignment was followed by an assignment to Division 11, then to External Operations, then to Transportation, then to Division 9, and finally to Division 11. The officer-to-inmate ratio varies depending on the area or division in question. Thus, for example, the officer-to-inmate ratio in External Operations was around 1:2 when Luckett worked there, whereas the ratio in

Divisions 1 through 11 was approximately 1:42-48. R. 49 at 56-57 (¶¶ 6, 8).[2] The extent to which a correctional officer has contact with inmates also varies with the area or division within the CCDOC. For example, inmates in their living quarters (Divisions 1-11) spend time in common areas without any barriers or restraints between them and the correctional officers guarding them. In Transportation, by contrast, the officers handcuff the inmates from outside the cell while the inmates are still inside the cell, and then transport the inmates in handcuffs. *Id.* at 57 (¶ 7).

Luckett suffers from Moyamoya disease (sometimes written as "Moya Moya"), which "is a rare, progressive cerebrovascular disorder caused by blocked arteries at

---

[2] Local Rule 56.1 requires a party responding to a fact statement to either admit or deny each paragraph of the statement and to cite his or her own supporting evidence. With respect to some of the facts set forth in Luckett's Rule 56.1(b)(3)(c) Statement of Additional Facts, including Luckett's testimony about officer-to-inmate ratios, the CCSO has not done that. *See, e.g.,* R. 58, ¶¶ 8, 12, 13, 14, 19. Instead, the CCSO moves to strike the asserted facts for lack of foundation, speculation, and/or inadmissible hearsay. While the CCSO may raise evidentiary objections to the evidence relied on by Luckett, such objections do not excuse the CCSO from "at least indicating that it agrees with or denies the allegation." *Ammons v. Aramark Uniform Servs., Inc.* 368 F.3d 809, 818 (7th Cir. 2004). Moreover, even if the CCSO had properly responded to the facts alleged by Luckett, that would not be sufficient to warrant summary judgment against Luckett. Because Luckett does not seek summary judgment in his favor but only opposes the CCSO's motion against him, the facts on which he relies need not be undisputed so long as they are supported. The facts in question are supported by Luckett's affidavit, and it is reasonable to assume that Luckett has personal knowledge of the matters to which he testifies in that affidavit. While the CCSO may be able to present a valid argument for its evidentiary objections to Luckett's affidavit, those objections in their current form (conclusory and unsupported) are an insufficient basis for the Court to disregard Luckett's testimony. The CCSO may raise its evidentiary objections again at the motions in limine stage of these proceedings. For present purposes, the Court can take Luckett's affidavit into consideration because he may be able to correct any evidentiary deficiencies to his testimony by the time of trial. *See Miksis v. Evanston Twp. High Sch. Dist. # 202,* 2017 WL 386652, at *23 n.42 (N.D. Ill. Feb. 2, 2017).

the base of the brain." https://www.ninds.nih.gov/Disorders/All-Disorders/ Moyamoya-Disease-Information-Page (last visited on 7/10/17).

> [T]he first symptom of Moyamoya disease is often stroke, or recurrent transient ischemic attacks (TIA, commonly referred to as "mini-strokes"), frequently accompanied by muscular weakness or paralysis affecting one side of the body, or seizures. . . . Individuals with this disorder may have disturbed consciousness, problems with speaking and understanding speech, sensory and cognitive impairments, involuntary movements, and vision problems.

*Id.* Luckett experienced some of these symptoms in 2010. He was diagnosed with Moyamoya disease after suffering a stroke and subsequently undergoing emergency brain surgery. This occurred in August 2011. The physicians with knowledge of Luckett's medical condition include his long-time primary care physician, Dr. Legrand, his treating neurologist, Dr. Schneck, and the neurosurgeon who performed his brain surgery, Dr. Anderson. *See* R. 36 at 22-24 (Luckett Dep. 80-86).[3]

---

[3] Luckett testified at his deposition that Dr. Anderson is his treating neurosurgeon who performed brain surgery on him in August 2011, yet his interrogatory responses confusingly state that he "*began* seeing Dr. Anderson in approximately *September 2012*." R. 31-1 at 169 (emphasis added). The CCSO adds to the confusion in its own statement of undisputed facts, which refers to Dr. Anderson as Luckett's neurologist, R. 35 at 3 (¶ 9), when it appears reasonably clear from the record that Dr. Schneck was Luckett's treating neurologist and Dr. Anderson was Luckett's treating neurosurgeon. R. 36 at 25 (Luckett Dep. 91). In one of the CCSO's fact statements to which Luckett did not object, the CCSO indicates that Dr. Anderson wrote a letter "[o]n November 28, 2012" stating that Luckett "should not return to work due to his 'worsening symptoms.'" R. 35 at 3 (¶ 9); R. 49 at 26 (¶ 9). But neither party has included the letter in the record. Instead, the CCSO cites to Luckett's deposition testimony for this fact, which does refer to such a letter, except that the deposition transcript indicates that it is dated November 29, 2014 rather than November 28, 2012. *See* R. 36 at 26 (Luckett Dep. 95). These and similar

Luckett was off work after undergoing brain surgery for approximately three months. Afterwards, Dr. Legrand and Dr. Anderson both wrote letters releasing him to work with no restrictions including clearance to carry a firearm. Luckett returned to work in November 2011. *Id.* at 24 (Luckett Dep. 87-88). When he returned to work, Luckett was assigned to Division 9, which houses violent inmates. Less than a year later, in September 2012, Luckett was attacked and beaten by an inmate. Neither party gives any details regarding the attack, but a report in the record indicates that Luckett remembers a door hitting him in the face and an inmate on him, punching him on the left side of his head. *See* R. 31-1 at 148. Luckett reported that he lost consciousness and woke up later at the hospital. *Id.* at 150. As a result of the attack, Luckett was again off work, this time on what the parties refer to as "duty injury." R. 36 at 25 (Luckett Dep. 89). During this time, Luckett sought treatment from a neuropsychologist named Dr. Randolph, who specializes in concussions. R. 36 at 17 (Luckett Dep. 58-59). Luckett testified that Dr. Randolph, as well as Dr. Schneck, diagnosed him with post traumatic distress disorder ("PTSD") as a result of the September 2012 inmate attack. *Id.;* R. 49 at 65 (Luckett Aff., ¶ 3); R. 31-1 at 169-70.[4]

---

discrepancies in the parties' factual presentations have made the Court's task of ruling on the CCSO's summary judgment motion more difficult, but in the end they are not dispositive of any issue presented by that motion.

[4] The CCSO objects that Luckett's testimony attesting to his PTSD diagnosis is hearsay. *See* R. 58 at 4 (¶ 12). Luckett states that he included both Dr. Randolph's and Dr. Schneck's medical opinions regarding his PTSD diagnosis as part of his workers compensation case that he filed with the Cook County Department of Risk Management ("Department of Risk Management"), but he does not include those medical opinions in the record. Whether Luckett thought it was not necessary to

Luckett's workers compensation claim for disability benefits was approved by the Department of Risk Management in November 2012. R. 36 at 25 (Luckett Dep. at 92). Thereafter, the Department of Risk Management directed Luckett to submit to an Independent Medical Examination ("IME"), the purpose of which was "to inform" the CCSO when Luckett was "released to return to work." R. 31-1 at 146 (Zalas Decl., ¶ 5). The IME was conducted on March 13, 2013 by Dr. Levin (*see* footnote 4). After examining Luckett and reviewing Dr. Randolph's neuropsychological evaluation, Dr. Levin concluded that Luckett had at most "a mild concussion with a headache" from the inmate attack, which Dr. Levin thought "[c]ertainly . . . should have resolved very quickly and definitely by six months after injury." R. 31-1 at 151. Dr. Levin stated that Luckett's "current symptomatology makes no sense with his alleged injury," and observed that, "as far as this possibly being a psychogenic problem [referring to Dr. Randolph's report], [Dr. Levin] would defer the possible etiologies to a psychologist . . . ." *Id.* Dr. Levin concluded that,

---

provide the Court with copies of those submissions, or whether he did not keep copies of them and could not obtain copies through discovery directed at the Department of Risk Management, is unclear. Dr. Randolph's medical evaluation of Luckett is referenced in another medical report that is included in the record. That report was prepared by a neurologist named Dr. Karen Levin, who is one of two independent medical examiners retained by the Department of Risk Management to examine Luckett after the inmate attack. Dr. Levin states in her report that she reviewed Dr. Randolph's report and she appears to acknowledge the latter's PTSD diagnosis. *See* R. 31-1 at 151 (observing that Dr. Randolph's report indicates that Luckett had "a variety of residual physical and cognitive complaints, some of which are clearly psychogenic"). While Luckett will need to present admissible evidence of his PTSD diagnosis at trial, it is clear from the record that the CCSO's objection is to form only and that there is no actual dispute that Luckett's treating physicians did in fact diagnose him with PTSD.

"from a neurologic standpoint, [Luckett] is at maximum medical improvement and can work . . . full duty." *Id.*

After receiving Dr. Levin's report, the Department of Risk Management reported to the CCSO that Luckett's temporary disability benefits had been terminated as of June 11, 2013 and that Luckett was not entitled to remain on duty injury after that date. R. 49 at 83. As a result, Luckett received word from the CCSO that he was to return to full duty work. Luckett objected because his psychiatrist had said he should not return to work until he had received treatment for his PTSD, and Luckett claims that the CCSO denied his request for psychiatric treatment. R. 31-1 at 172; *see also* R. 9 at 3 (¶ 21).[5] It appears to be undisputed that the Department of Risk Management later changed its position from that stated in the June 11, 2013 notice because Rosemarie Nolan, who was the then-Deputy Chief of Human Resources for the CCSO, testified at her deposition that Luckett's disability benefits in fact were not terminated at that time and that Luckett remained off duty.

Approximately four months later, in October 2013, the Department of Risk Management directed Luckett to submit to a second IME. *See* R. 31-1 at 147 (Zalas Decl., ¶ 8). This time Luckett was sent to a neuropsychologist rather than a

---

[5] As will be seen, one of Luckett's claims in this case is that the CCSO discriminated against him by denying him psychiatric treatment for his PTSD. It is undisputed however, that Luckett ultimately obtained psychiatric treatment for his PTSD through his medical insurance, and that he also received approximately $28,000 as reimbursement for medical expenses through his worker's compensation claim (in addition to another $60,000 in indemnity payments). *See* R. 31-1 at 147 (Zalas Decl., ¶ 11).

neurologist. *See* R. 31-1 at 105 (Hartman Decl., ¶¶ 2-4). The neuropsychologist, Dr. David Hartman, agreed with Dr. Levin's conclusion from seven months earlier that Luckett's "workplace injury was consistent with, at most, a mild concussion that would normally be expected to resolve quickly." *Id.* at 135. He also agreed that there was "no objective neurological evidence of brain injury related to the workplace injury." *Id.* As to Luckett's psychological condition (on which Dr. Levin had not opined), Dr. Hartman concluded that Dr. Randolph's previous diagnosis of PTSD was "nondispositive and below standard of care in its failure to objectively assess for the possibility of symptom endorsement exaggeration." *Id.* at 136. Specifically, Dr. Hartman believed that Luckett's self-reported symptoms of depression and anxiety were likely "simulate[d]," *id.* at 135, because Luckett had "displayed implausibly poor effort in both Dr. Randolph's neuropsychological evaluation and in my own assessment," *id.* at 132. While Dr. Hartman acknowledged that Dr. Randolph considered Luckett's "failed validity testing" to "be of *subconscious* origin," *id.* at 133 (emphasis in original), Dr. Hartman disagreed, stating that Luckett's "below-chance findings" on Dr. Randolph's testing "represent evidence of deliberate under-performance, and when occurring within a secondary gain context, supports a conclusion of malingering," *id.* at 133 (internal quote marks omitted). According to Dr. Hartman, because Luckett "was engaged in litigation or planning to litigate workplace injury, this profile would be more consistent with malingering for potential secondary gains of compensation and/or work avoidance." *Id.* In other words, Dr. Hartman discounted Luckett's treating physicians' medical

opinion of PTSD based on Luckett's workers compensation claim and the incentive that claim gave him to exaggerate the extent of his psychological injuries stemming from the inmate attack. Dr. Hartman concluded that Luckett was at "maximum medical improvement" from the September 2012 attack, not only physically but "from a neuropsychological and psychological perspective" as well. *Id.* at 137.

While Dr. Hartman concluded that the inmate attack no longer physically or psychologically affected Luckett's ability to work, he nonetheless expressed reservations as to whether Luckett's "history of stroke, Moyamoya and hypertension would allow him to continue employment as a prison guard." *Id.* at 136. Dr. Hartman also stated that he could not "rule out the possibility that some of [Luckett's] apparent difficulty understanding complex instructions may be related to left hemisphere cerebrovascular occlusion from Moyamoya," and also noted that Luckett's "hypertensive blood pressure readings . . . speak to inadequate blood pressure control and/or treatment non-compliance." *Id.* at 134. In a concluding paragraph, Dr. Hartman stated that Luckett "is *not* released to work," because "[h]is medical status unrelated to the injury in question requires evaluation *vis a vis* hypertension, functional capacity, driving and weapon-carrying status." *Id.* at 137 (emphasis added). "From the standpoint of neuropsychological and psychological *accident-related* issues," however, Dr. Hartman found that "there is no barrier to immediate work return." *Id.* (emphasis added).

After receiving Dr. Hartman's report, around the end of February 2014, Nolan called Luckett to inform him that he was to immediately return to work full

duty. R. 35 at 5 (¶ 22). This happened despite Dr. Hartman's specific statement in his report that Luckett possibly had continuing psychological and/or physical limitations (albeit not stemming from the inmate attack), and that he was not released back to work. Luckett testified that he told Nolan he had not been treated for, and continued to suffer from, PTSD. He further testified that he requested a transitional work assignment to a low-or no-inmate contact position, and that Nolan directed him to apply for one and submit a doctor's note to support his request. *Id.* (¶ 23). Luckett's disability benefits were terminated on February 18, 2014. *See* R. 31-1 at 65 (Nolan Dep. 16-17). He received formal notification in the mail that his IME indicated an ability to return to full duty work and that he was to report to work "no later than Wednesday February 26, 2014." R. 35 at 5 (¶ 24); *see also* R. 49 at 84 (Sheriff's Personnel Office Memorandum indicating a "Release For Duty Date" of 02-25-2014). Luckett complied with this direction and returned to work at the end of February 2014.

Upon returning to work, Luckett was assigned to Division 11. While Division 11 houses medium security inmates, it is undisputed that included among them were violent offenders. *See* R. 49 at 57 (¶ 9); R. 58 at 3 (¶ 9). Luckett's job responsibilities in Division 11 were to supervise inmates, make sure they were following the rules and regulations, and make sure they were getting medical treatment and meals. R. 49 at 57 (¶ 10). Luckett was singly responsible for monitoring approximately 48 inmates during his 7 a.m. to 3 p.m. shift. *Id.* (¶ 15); *see also id.* (¶¶ 8-9). Luckett's work station was located in the day room in the inmates'

common space, where the inmates are free to walk around unrestrained from approximately 7:30 a.m. to 1:00 p.m. each day. *Id.* at 58 (¶ 16).

Luckett states that after being ordered by Nolan to return to work he put in a written request for an accommodation and/or transitional work assignment, which was denied. On June 18, 2014, Luckett again requested a transitional move from his position in Division 11 due to his PTSD, this time contacting Sean Lynch, his Personnel Supervisor. *See* R. 31-1 at 48; R. 49 at 85 (Cook County Department of Corrections Memorandum "requesting an American with Disabilities Act (ADA) assignment or something low level inmate contact," based on PTSD, which was causing depression, anxiety and sleepless nights; "[a]ny kind of transitional assignment would be greatly appreciated"). Lynch put Luckett in contact with Sabrina Rivero-Canchola, who had taken over responsibility for processing accommodation requests from Nolan. R. 31-1 at 49. Rivero-Canchola directed Luckett to complete a Cook County Sheriff's Office ADA Request Form. *Id.* at 50. Luckett submitted the form on June 19, 2014, in which he requested as an accommodation "[a]ny assignment with low inmate contact to none" due to the PTSD he suffered as a result of the inmate attack that occurred in September 2012. *Id.* at 51.

On June 20, 2014, Rivero-Canchola sent Luckett an email stating that, "[i]n order to evaluate your eligibility for ADA accommodations we will need you to provide us with a letter from your doctor stating your diagnoses as well as your duty limitations." *Id.* at 54. Luckett responded to Rivero-Canchola's email by

providing a letter from his long-time treating internist, Dr. Legrand, dated June 24, 2014, which states that Luckett has PTSD and that "he should have little to no contact with inmates." *Id.* at 55. After receiving this letter, on June 27, 2014, Rivero-Canchola sent an email to Mark Robinson, Chief Union Steward at the CCSO, asking to put into effect an accommodation for Luckett:

> I'm working on getting a correctional office[r] (John Luckett) reassigned to the visitor information center as part of an ADA accommodation. Do you need anything from me in writing to put this into effect? I would like to have it be effective Monday morning.

*Id.* at 100. Robinson responded, "No I do not and thank you." *Id.* Rivero-Canchola testified that to make the accommodation happen by "Monday morning," as stated in the email, she needed to obtain the approval of the Executive Director's office. *Id.* at 86-87 (Rivero-Canchola Dep. 37-38). Apparently in furtherance of that goal, Rivero-Canchola sent an email to an employee in that office, Mary McQuillan, which also stated that Rivero-Canchola was seeking to put an accommodation into effect for Luckett "effective Monday morning." *Id.* at 87 (Rivero-Canchola Dep. 41). Like Robinson, McQuillan's email response did not object to the accommodation, indicating only that Luckett might have to agree to a different shift time. *Id.* at 101.

Rivero-Canchola testified at her deposition that at some point after sending the emails to Robinson and McQuillan, she "learned of the IMEs and realized that they[ ] [contained] conflicting information." *Id.* at 86 (Rivero-Canchola Dep. 36-37). In her view, the conflicting information raised questions as to whether Luckett actually suffered from PTSD. R. 35 at 9 (¶ 47); R. 36 at 64 (Rivero-Canchola Dep. 75). On July 2, 2014, Rivero-Canchola emailed Luckett with instructions to obtain

"a new letter from [his] doctor stating that he is releasing [Luckett] back to work, but with the restriction of limited to no inmate contact based on [Luckett's] diagnosis of PTSD." R. 31-1 at 102. Rivero-Canchola's email, however, did not inform Luckett about her concerns stemming from the previous IMEs or explain to him why he would need a doctor's release back to work when he had been back at work already for approximately the past three months per Nolan's order (and, according to Luckett, contrary to his own expressed wishes based on the advice of his treating physicians). Luckett therefore sought further clarification, writing back to Rivero-Canchola:

> I [ ] already have a letter stating that I'm suffering from PTSD with little to no inmate contact. I have attached it again. Also I am confused, you stated "The IME Independent Medical Review from October 2013 did not release me back to work full duty," or did it release me back to work full duty[?]

*Id.* Rivero-Canchola responded by explaining to Luckett that his October 2013 IME released him back to full duty "as to [his] duty injury in 2012," but that "it was unclear as to whether [his] pre-existing conditions created duty limitations." *Id.* Therefore, she explained, she would "need a letter from [his] doctor [ ] releasing [him] back to full duty, but with the restriction of limited to no inmate contact based on [the doctor's] diagnosis of PTSD," which note should also state "whether the restrictions are permanent or temporary" and "be more detailed as to the reasons [the doctor] [was] suggesting limited/no inmate contact." *Id.*

Luckett claims that, on July 7, 2014, he supplemented the letter from Dr. Legrand with a letter from Dr. Schneck, which stated that Luckett was being

13

treated "for post traumatic stress disorder, post concussive syndrome and [ ] a history of Moya Moya syndrome and also status post stroke." R. 49 at 79. Dr. Schneck recommended that Luckett "have little to no contact with inmates, due to noted neurological problems as stated above," and that "[h]e should be in a transitional work assignment for an undetermined length of time." *Id.* The record also contains a hand-written note from Luckett's then-treating psychiatrist, Dr. Lilly Huang, stating that, due to Luckett's traumatic experience at work, Dr. Huang recommended that he "work at a different position (work transitional assignment)." R. 49 at 80. Rivero-Canchola testified that she never received any doctors letters other than the initial one from Dr. Legrand. Luckett, on the other hand, testified that he hand-delivered at least three doctor's letters to Rivero-Canchola, including the June 24, 2014 letter from Dr. Legrand, the July 1, 2014 note from Dr. Huang, and the July 7, 2014 letter from Dr. Schneck. *See* R. 49 at 66 (¶¶ 11, 13).[6]

---

[6] The CCSO asks the Court to disregard Luckett's affidavit testimony about hand-delivering the two other doctors notes to Rivero-Canchola because of Luckett's deposition testimony in which he supposedly said that he only met Rivero-Canchola in person once when he dropped off the first note written by Dr. Legrand. While the CCSO acknowledges that other parts of Luckett's deposition testimony support Luckett's current assertion that he hand-delivered three doctors' letters to Rivero-Canchola (the Legrand note in June and the Schneck and Huang notes in July) it argues that no reasonable juror could credit Luckett's testimony over Rivero-Canchola's testimony that she only received the first medical note from Dr. Legrand because Luckett's testimony is internally inconsistent. The Court has reviewed Luckett's deposition testimony, which is confusing at times. But that confusion is at least partly due to the leading questions used by counsel for the CCSO to provide details that Luckett was apparently having trouble remembering. While Luckett at first answered "once" when asked how many times he had met Rivero-Canchola, he immediately changed his answer to "twice" and stated that he "hand-carried the

Apparently, no further contact between Luckett and Rivero-Canchola occurred until approximately two weeks later, when Luckett received a letter from Rivero-Canchola dated July 23, 2014 notifying him that his request for an accommodation had been denied. The reason stated in the letter for the denial was that Luckett "did not provide the requested medical documentation to make an informed determination." R. 31-1 at 103; *see also* R. 36 at 61 (Rivero-Canchola Dep. 62) (Luckett's accommodation request was denied because he failed to provide appropriate medical documentation, which should have included "everything I asked for in our previous correspondence," referring to Rivero-Canchola's July 2, 2014 email to Luckett). Luckett filed the present lawsuit on August 8, 2014, a little over two weeks after receiving the CCSO's letter denying his accommodation request.[7]

---

letters" (using the plural) to Rivero-Canchola. R. 36 at 15 (Luckett Dep. 50). Opposing counsel then referenced only one "letter" (using the singular) in the follow-up questioning, and Luckett did not correct her. *Id.* Overall, the Court's impression of Luckett's deposition testimony is that it supports rather than contradicts Luckett's affidavit testimony that he hand-delivered three letters to Rivero-Canchola. The Court is not resolving the disputed fact issue created by Rivero-Canchola's contrary testimony, but only noting that the evidence is sufficient to create a reasonable dispute on that fact issue.

[7] Luckett alleges that he filed an EEOC charge on or about April 29, 2014, and that he received a right to sue letter only eleven days later, on or about May 10, 2014. *See* R. 9 at 6 (Amended Complaint, ¶¶ 41-42). The CCSO responded to this allegation that it lacked knowledge or information sufficient to respond, R. 12 at 9, and, as far as the Court can tell, no document pertaining to the EEOC proceedings has been filed in this case. If the dates alleged in the complaint are correct, then Luckett filed the EEOC charge and received the right to sue letter *before* he made the June 18, 2014 accommodation request and before the CCSO denied that request on July 23, 2014, in which case the EEOC right to sue notice would relate to Luckett's earlier requests for an accommodation directed at Nolan. The record is unclear regarding precisely when and how Luckett requested an accommodation

## A.  DISPARATE TREATMENT CLAIMS

Luckett alleges that he was subjected to disparate treatment because of his disability (PTSD[8]) (Count I) and because of his race (African-American) (Count III). The CCSO moved for summary judgment on Luckett's disability disparate treatment claim and Luckett failed to respond to that aspect of the CCSO's motion. Accordingly, the CCSO's motion for summary judgment as to Count I is granted. *See Goodpaster v. City of Indianapolis,* 736 F.3d 1060, 1075 (7th Cir. 2013) (holding that because the plaintiffs "did not provide the district court with any basis to decide their claims, and did not respond to the City's arguments, these claims are waived"), *cited in Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1243 (S.D. Ind. 2014) (the plaintiff's "utter failure to respond" to an argument made by the defendant "constitutes a concession of the issue").

---

through Nolan, *see, e.g.,* R. 36 at 31-33 (Luckett Dep. 113-121); R. 31-1 at 172, or when, how, and by whom that request was denied. The parties' focus in this litigation has been on the later June 18, 2014 accommodation request and July 23, 2014 denial of that request. Because failure to exhaust administrative remedies is an affirmative defense that can be waived by the defendant, the Court assumes that, by not having raised the issue, the CCSO does not contest that Luckett properly exhausted his administrative remedies with respect to the CCSO's July 23, 2014 denial of Luckett's June 18, 2014 accommodation request.

[8] In addition to PTSD, Luckett alleges that he also suffers from post-stroke, post-concussion and post Moyamoya syndrome. *See* R. 36 at 17 (Luckett Dep. 58); R. 49 at 58 (¶ 17). It is not clear to what extent Luckett relies on these other illnesses for his discrimination claims. Based on Dr. Schneck's letter of July 7, 2014, however, Luckett's other illnesses clearly factor into his accommodation request. But because Luckett focuses on his PTSD, the Court will do the same.

The Court thus turns to Luckett's claim of race discrimination in Count III. The law relating to discrimination is well known in this district. To succeed on a claim for discrimination under Title VII, a plaintiff must present evidence that (1) he is a member of a statutorily protected class; (2) he suffered an adverse employment action; and (3) discriminatory intent, shown by either direct or indirect evidence. *See Jones v. Res-Care, Inc.,* 613 F.3d 665, 671 (7th Cir. 2010).[9] Luckett alleges that he was discriminated against because of his race when the CCSO: (a) refused to approve his request for treatment during his worker's compensation proceeding, (b) forced him to return to work full duty, outside of the recommendations of his treating physician, and (c) repeatedly denied his request for a transitional work assignment. R. 9 at 10 (¶ 59). For present purposes, the Court will assume that these allegations, if true, would be sufficient to establish the adverse employment action requirement for Luckett's race discrimination claim. Nevertheless, the Court concludes that summary judgment on Luckett's race

---

[9] Traditionally, courts have evaluated the evidence of discriminatory intent to determine whether it survives summary judgment using one of two methods—the direct method and the indirect method (adapted from the test established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). Under either method, courts in this district would focus on whether the plaintiff's evidence presented "a 'convincing mosaic' of circumstantial evidence that would permit the same inference without the employer's admission." *Coleman v. Donahoe,* 667 F.3d 835, 860 (7th Cir. 2012). Recently, however, the Seventh Circuit has said that "[t]he use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years," and that "[t]he time has come to jettison these diversions and refocus analysis on the substantive legal issue." *Ortiz v. Werner Enter., Inc.,* 834 F.3d 760, 764 (7th Cir. 2016). The "sole question that matters," the Seventh Circuit said, "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

discrimination claim is appropriate because Luckett has presented no evidence from which a reasonable jury could infer discriminatory intent.

The types of evidence a court considers in deciding whether there is a triable issue of fact on the question of the defendant's discriminatory intent include "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011). The court is to consider all of the possibly relevant evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765. Here, the only evidence cited by Luckett is in the third category. Specifically, Luckett points to two correctional officers who allegedly were similarly situated to him but were not African-American, and who supposedly were treated better than he was when they requested a transitional work assignment. *See* R. 49 at 20-21; *id.* at 49 (¶ 59). But the only evidence Luckett cites in this regard is his own deposition testimony, and Luckett is not competent to testify regarding those officers' situation because it is clear from his testimony that he lacks personal knowledge of those facts.

Moreover, even if the Court were to consider Luckett's deposition testimony on this issue, that testimony does not contain enough information about the two officers to create a disputed issue of fact as to whether they were "similarly

situated" to Luckett. *See Walker v. Bd. of Regents of the Univ. of Wis. Sys.,* 410 F.3d 387, 397 (7th Cir. 2005) (to qualify as similarly situated, a fellow employee must be "directly comparable to the plaintiff in all material respects"); *see also Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (the similarly situated inquiry requires evidence that the comparators are "similarly situated with respect to performance, qualifications, and conduct," and "engaged in similar conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them"). Luckett testified that he has no idea what disability each of the two officers in question suffered from, or who, when or why they were approved for a transitional work assignment. The only information he appears to know (which is itself hearsay) is that they asked for and received some type of transitional work assignment. Without any further information about the disabilities suffered by the two officers, the circumstances of their request for a transitional work assignment, the decisions reached by the CCSO on those requests, and the reasons for those decisions, the Court cannot say that the two officers are sufficiently similar to Luckett to constitute adequate comparators from which discriminatory intent might be inferred. *See, e.g., Bradford v. City of Chicago*, 121 Fed. App'x 137, 139-40 (7th Cir. 2005) (information regarding other employees held insufficient to survive summary judgment on the question of whether similarly situated employees were treated more leniently than the plaintiff).[10]

---

[10] The CCSO states that the two officers in question were treated differently because they "provided comprehensive diagnostic statements from their physicians stating that they had permanent restrictions pursuant to the ADA, that they can

The CCSO makes a number of other arguments regarding why it is entitled to summary judgment on Luckett's Title VII claim. For instance, the CCSO argues (1) Luckett does not qualify for a transitional work assignment; (2) the Department of Risk Management, not the CCSO, denied Luckett treatment for his PTSD, and, in any event, Luckett had no legal entitlement to employer-provided psychiatric treatment; and (3) it ordered Luckett to return to work in February 2014 in good faith based on the results of the October 2013 IME. These arguments, for the most part, are based on either disputed facts or inadequate and/or faulty legal or factual analysis of the issue.[11] The Court need not comment further on any of these issues,

_____

return to work, and their specific restrictions such as how long they can stand and how far they can walk." R. 35 at 12 (¶ 66). Luckett disputes these facts, claiming (1) that the CCSO cannot rely on the "self-serving" declarations submitted by the individuals who made the decision to grant the comparators' requests for a transitional work assignment (Nolan and Rivero-Canchola); and (2) that "he [Luckett] cannot present facts essential to justify his opposition." R. 49 at 50-51. The Court need not address Luckett's objections to the Nolan and Rivero-Canchola declarations because Luckett has the burden of first coming forward with some evidence of similarity before the CCSO has any burden of refuting similarity, and he has not done so.

[11] For instance, a factual dispute exists regarding whether the CCSO's decision to order Luckett back to work in February 2014 was made in good faith when the October 2013 IME expressly stated that Luckett was *not* released back to work. While the CCSO argues that the decision was in good faith even if possibly mistaken, a reasonable factfinder considering the evidence in the record might disagree. In addition, the CCSO's argument that it had no obligation to provide Luckett with psychiatric treatment is based on case law decided in the context of a failure to accommodate, not disparate treatment, disability discrimination claim. *See, e.g., Stevens v. Rite Aid Corp.,* 851 F.3d 224 (2d Cir. 2017) (citing authority that rejects the proposition that an employer is obligated "to offer employees medical treatment as a reasonable accommodation under the ADA"). While the CCSO may not have had a legal obligation to accommodate Luckett's disability by offering him treatment, it is a different question entirely whether the CCSO might be liable under Title VII for denying Luckett such treatment because of his race. Finally, neither party provides the Court with any pertinent legal or factual authority to

however, because Luckett has provided no evidence whatsoever that race was a motivating factor for the CCSO's actions and/or decisions at issue. Therefore, even if the CCSO has not established a basis for summary judgment with any of these other arguments, the CCSO still is entitled to summary judgment on Count III because Luckett has failed to "supply evidence sufficient to allow a jury to render a verdict in [his] favor." *Basith v. Cook Cnty.,* 241 F.3d 919, 926 (7th Cir. 2000).

## B.  FAILURE TO ACCOMMODATE CLAIM

In addition to his disability disparate treatment claim in Count I, Luckett also alleges a failure to accommodate disability discrimination claim in Count II. *See id.* at 927 ("under the ADA, there are two distinct categories of disability discrimination claims: failure to accommodate and disparate treatment"). A failure to accommodate theory of disability discrimination looks at whether the employer made reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. *See* 42 U.S.C. § 12112(b)(5)(A); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996). Luckett's failure to accommodate claim is that the CCSO violated the ADA when it refused to grant his request to be assigned to an area or division of the CCDOC in which he would have limited to no inmate contact.

---

make a decision on whether the CCSO can be held liable for the Department of Risk Management's purported denial of Luckett's request for psychiatric treatment.

### 1.    WHETHER LUCKETT IS A "QUALIFIED INDIVIDUAL WITH a DISABILITY"?

"In a reasonable accommodation case, like the present one, the plaintiff must first show that: 1) he was disabled; 2) his employer was aware of his disability; and 3) he was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of the employment position." *Basith*, 241 F.3d at 927. As an initial matter, it is not entirely clear whether the CCSO disputes whether Luckett has shown he has a disability. The CCSO correctly points out that a diagnosis of PTSD does not automatically mean that Luckett is disabled for purposes of the ADA. Instead, Luckett's PTSD must be such that it "substantially limits" one or more of his "major life activities[12]." 42 U.S.C. § 12102(1)(A); *see Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000) (plaintiff must demonstrate "not only" that she suffers from depression but that "her depression substantially limits her ability to perform a major life activity").

It is true that the CCSO argued in its opening summary judgment brief that Luckett's PTSD does not substantially limit the major life activity of working. But the CCSO made that argument *only* with regard to Luckett's disability disparate treatment claim in Count I, despite the fact that establishing the existence of a disability is a predicate to both Count I and Luckett's failure to accommodate claim in Count III. *See, e.g., Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th

---

[12] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Cir. 2012). In his opposing brief, Luckett responded on the merits to the CCSO's argument that his PTSD did not substantially limit his ability to work, and in addition argued that his PTSD also substantially limited him in at least three other major life activities—his ability to eat, sleep and dress. Luckett specifically made that argument, however, only in the context of his failure to accommodate claim (Count II). *See* R. 49 at 2-8. The CCSO then failed to respond in its reply brief to Luckett's arguments on this issue, and ignored the disability question altogether.[13] At the very least, in failing to address Luckett's arguments regarding the impact of his PTSD on his abilities to sleep, eat, and dress, the CCSO has waived any summary judgment argument with respect to those issues. *See Goodpaster, supra,* 736 F.3d at 1075. Accordingly, the Court need not resolve the parties' dispute over whether Luckett has presented sufficient evidence to survive summary judgment on the question of whether his PTSD substantially limits his ability to work. The CCSO's failure to dispute that Luckett's PTSD substantially limits life activities other than work means that Luckett succeeds by default in showing for purposes of the present motion that he is disabled under the ADA on the alternative ground that his PTSD substantially affects his ability to sleep, eat, and dress. *See Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments[.]") (internal quotation marks and citation omitted).

---

[13] The parties' summary judgment briefs in many respects were like ships passing in the night, with only fragments of each side's arguments directly responding to the other side's arguments.

To survive summary judgment, however, Luckett must show not only that he has a disability but that he is a "qualified" individual with a disability. *Basith*, 241 F.3d at 927 ("The ADA only protects a 'qualified individual with a disability.'").

> To determine whether someone is a "qualified individual with a disability," [the court] appl[ies] a two-step test. First, [the court] consider[s] whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, *etc.* If he does, then [the court] must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation.

*Id.* (internal quotation marks and citations omitted).

The CCSO does not question that Luckett satisfies the prerequisites for his position as a correctional officer. The issue raised by the CCSO relates to Luckett's ability to perform the essential functions of his job. Although it would seem to be important to first discuss what the essential functions of the job of correctional officer are,[14] the CCSO ignores that issue and instead argues that Luckett is not entitled to an accommodation because he admitted at his deposition that he is capable of performing the job of a correctional officer even without an accommodation of a position with little to no inmate contact. This argument is based on *Brumfield v. City of Chicago,* 735 F.3d 619 (7th Cir. 2013), wherein the Seventh Circuit held that "an employer's accommodation duty is triggered *only* in

---

[14] *See Basith,* 241 F.3d at 927 ("To determine the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment of a position, written job descriptions prepared before advertising or interviewing applicants for the job, the work experience of past incumbents of the job, and the work experience of current incumbents in similar jobs.").

situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job." *Id.* at 632 (emphasis added). "[A]n employer need not accommodate a disability that is irrelevant to an employee's ability to perform the essential functions of [his] job," the court said, "not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place." *Id.*

The CCSO argues that *Brumfield* applies here because of the following exchange that took place during Luckett's deposition:

> Q: What job duties and responsibilities are you unable to perform because of your disability? Having inmate contact?
>
> A: I mean I had to do it—I did it.
>
> Q: But you're saying that you were uncomfortable?
>
> A: Yes. I'm very uncomfortable.
>
> Q: Other than that is [sic] there any other duties and responsibilities that you're unable to perform because of your disability?
>
> A: I mean, I'm able to perform them because they forced me to. I have to adapt.
>
> . . . .
>
> Q. And you believe that getting an accommodation of limited-to-no-inmate contact would have allowed you to perform your job duties comfortably?
>
> A. Yes.

R. 36 at 18-19 (Luckett Dep. 64-65). The Court disagrees that this deposition testimony precludes Luckett's failure to accommodate claim.

*Brumfield* holds that "an employer need not accommodate a disability that is *irrelevant* to an employee's ability to perform the essential functions of her job." 735 F.3d at 632 (emphasis added). Common sense would suggest that Luckett's PTSD is not *irrelevant* to his ability to perform his job as a correctional officer, and his affidavit submitted in opposition to the CCSO's summary judgment motion supports that conclusion. Luckett states in his affidavit that, after the September 2012 inmate attack, he became depressed and unable to sleep, and he experienced constant fear and anxiety while at work. R. 49 at 67 (¶ 23). He further explains that because of his constant state of fear and anxiety: (1) it is difficult for him to supervise the inmates in assignments with a low officer-to-inmate ratio; (2) he is delayed in responding to inmate inquiries and conflicts, affecting his ability to de-escalate inmate confrontations in the unit as well as his abilities in ensure the safety of everyone at the jail; (3) he is afraid to leave his desk area, impairing his ability to move around and monitor inmates to make sure they are following the rules and regulations of the facility; (4) he is withdrawn, and has trouble interacting and communicating with the inmates and others at work, which also interferes with his ability to monitor inmates; and (5) he has trouble eating and sleeping, causing him to be groggy and sluggish at work and to experience difficulties concentrating and mentally focusing on his job duties. He further states that when he sees multiple people (more than two) in a group, he fears an attack, and will focus on how to escape, instead of focusing on his job duties or monitoring the inmates to

make sure they are following CCDOC rules and regulations. *See* R. 49 at 67-68 (¶¶ 24-28).

The CCSO argues that the Court should disregard Luckett's affidavit because it violates the rule that a party cannot avoid summary judgment by submitting "an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir. 1987). But Luckett's affidavit is not conclusory. Moreover, the "sham affidavit" rule only "applies when the change is incredible and unexplained. In contrast, when the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory, a change in testimony affects only its credibility, not its admissibility." *McCann v. Iroquois Mem'l Hosp.,* 622 F.3d 745, 750-51 (7th Cir. 2010) (internal quotation marks and citations omitted). The Court has reviewed Luckett's deposition testimony and concludes that his affidavit testimony falls into the latter, permissible category. In the first place, much of the deposition testimony on which the CCSO relies consists of Luckett responding to leading questions where the words were put into his mouth by counsel for the CCSO, including the word on which the CCSO focuses here—"uncomfortable." Luckett may not have understood the full context or import of what counsel intended when asking the questions she did. In any event, Luckett's deposition testimony overall is consistent with his affidavit. He testified that to cope with his PTSD he has to take psychotropic medication and see a psychiatrist. He takes Prozac, Wellbutrin, Lunesta, and Clomazepam. R. 36 at 17-18 (Luckett Dep 60-61).

His PTSD made him not "want to be around the inmates, not a bunch of them by myself." *Id.* at 18 (Luckett Dep. 63-64). He can work around inmates, but only "[a]s long as other officers are right there with [him]." *Id.* (Luckett Dep. 64). He testified that he is only able "to perform [his] job duties and responsibilities *that do not require inmate contact*." *Id.* (emphasis added).

The CCSO argues that being "uncomfortable" is not grounds for an accommodation. *See* R. 57 at 5 ("The fact that [Luckett] did not want to be around inmates or that he is uncomfortable around inmates does not entitle him to an accommodation."). In support of that argument, the CCSO cites *Sheahan v. Dart*, 2015 WL 1915246 (N.D. Ill. Apr. 23, 2015). But the plaintiff in *Sheahan* sought an accommodation for physical disabilities (herniated disk and degenerative eye condition), not a psychological condition like PTSD. The court granted summary judgment to the defendant because the plaintiff did "not complain that his back injury prevented him from fulfilling the duties of a Deputy Sheriff II. Rather, he allege[d] only that his back injury made him more concerned about possible re-injury if he were again attacked by detainees." *Id.* at *5. There was no evidence in *Sheahan* that the plaintiff's psychological "discomfort" in performing his job duties due to his fear of reinjuring himself was itself a disability under the ADA. Further, unlike the plaintiff in *Sheahan,* who "failed to offer any countervailing evidence that his back injury or his eye problems meaningfully impaired his ability to perform" his job duties, *id.,* Luckett *has* submitted evidence that his PTSD does meaningfully

impair his ability to perform his duties in Division 11—his affidavit and letters written by his treating physicians.

The CCSO also cites *Hooper v. Proctor Healthcare Inc.*, 804 F.3d 846 (7th Cir. 2015), in which the Seventh Circuit affirmed summary judgment against an employee seeking an accommodation for his bipolar disorder. Bipolar disorder, like PTSD, is a mental illness, but there was no obvious link in that case between the plaintiff's bipolar disorder and his job duties, whereas here there is an obvious link between Luckett's PTSD and his job duties as a correctional officer. More to the point, however, the reason the Seventh Circuit gave for affirming summary judgment against the plaintiff in *Hooper* was that the plaintiff had been cleared to return to work by a psychiatrist who had been retained by the defendant to look into the issue of his psychological fitness for work, and the psychiatrist had "specifically found that [the plaintiff] was qualified for his position *without* accommodations." *Id.* at 852 (emphasis in original).[15] Here, in contrast, Luckett claims he presented the CCSO with medical opinions of multiple treating physicians who all stated that his PTSD, either alone or in combination with his preexisting conditions, required that he be given an accommodation of a work assignment other than the one he had in Division 11. Moreover, the only contrary

---

[15] *Brumfield* involved similar facts, where the only evidence on the issue of whether the plaintiff could perform her job even without an accommodation was a physician's testimony that she was. *See Brumfield,* 735 F.3d at 622-23 (noting that the plaintiff "began to experience unspecified 'psychological problems' that interfered with her ability to sleep, eat, and concentrate," that "[t]he City became aware of these difficulties and required her to submit to psychological examinations on four separate occasions," and that "[e]ach time [the plaintiff] was found capable of continuing her work as a police officer").

medical evidence is the report of Dr. Hartman, a specialist retained by the Department of Risk Management, who specifically withheld an opinion as to whether, because of preexisting conditions, Luckett was fit to return to work.[16]

The Court also disagrees with the CCSO that the fact that a plaintiff continues working despite his illness means he is not entitled to an accommodation. As the Fifth Circuit has stated,

> Considering plaintiffs' abilities to perform their jobs as evidence weighing against finding that they are disabled under the ADA would create an impossible catch-22 for plaintiffs: if their disabilities prevented them from doing their jobs altogether they would not be qualified individuals for the job under the ADA, and if they were able to work through their disabilities they would then not be considered disabled.

*E.E.O.C. v. Chevron Phillips Chem. Co., LP,* 570 F.3d 606, 619 (5th Cir. 2009) (citing *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 24 (1st Cir. 2002) (declining to adopt rule that would impose "an unenviable 'catch-22:' in order to demonstrate that she is disabled, the plaintiff would also have to demonstrate why she is unqualified to do the job to which she aspires")). A rule that "unless it [is] impossible for plaintiff to do h[is] job without the accommodations, [ ]he [is] not entitled to them . . . suggests a disturbing standard for determining whether an accommodation is reasonable. It may be that plaintiff could open the front door with great difficulty or make her way through the parking lot without falling each time, but should she have to? A paraplegic might be able to get out of her wheel chair and

---

[16] It is irrelevant to the accommodation issue that Dr. Hartman disagreed with Luckett's treating physicians on the reasons why Luckett still had physical and psychological issues that might prevent his release to work.

pull herself up a flight of stairs as well, but that does not mean an employer may refuse to install a ramp or an elevator on that ground." *Sturz v. Wis. Dep't of Corr.*, 642 F. Supp. 2d 881, 887-88 (W.D. Wis. 2009).[17]

Moreover, even if *before* the passage in 2008 of the Americans With Disabilities Act Amendments Act ("ADAAA") it made sense to say that a plaintiff is not entitled to an accommodation because he testifies that he "is able to perform the job" or "the work gets done," it no longer makes sense under the new standard for disability found in the 2008 Amendments.[18] *See, e.g.,* 42 U.S.C. § 12102(4)(E)(i)(I) and (III) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication . . . [or] reasonable accommodations."). The old standard, applicable to ADA claims arising out of events that occurred prior to January 1, 2009 (the effective date of the ADAAA) was that the term disability was to "be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).

---

[17] *See also Muovich v. Raleigh Cnty. Bd. of Educ.*, 58 Fed. App'x 584, 591 (4th Cir. 2003) ("We see no reason to penalize a plaintiff who is willing to continue working, despite substantial discomfort and the risk of worsening—and possibly permanent—injury, when her employer refuses to provide a reasonable accommodation."); *Wirey v. Richland Cmty. Coll.*, 913 F. Supp. 2d 633, 640-42 (C.D. Ill. 2012) (stating that a rule which would "require[ ] an individual with a physical or mental impairment to miss work or leave early in order to qualify for a disability" would be "absurd" because it "would encourage that individual to be absent from work in order to demonstrate that they suffered from a disability").

[18] Because the events in this case occurred after January 1, 2009, the 2008 Amendments apply. *See Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 n. 3 (7th Cir. 2012).

Congress sought to reverse that rule and to make the standard for qualifying as disabled more inclusive. *See* ADA Amendments Act of 2008, Pub. L. No. 1.10–325, 122 Stat. 3553; *Fleishman,* 698 F.3d at 606 n. 3 (The ADAAA "broadened the ADA's protection . . . to, inter alia, include a wider range of impairments that substantially limit a major life activity."). Under the new standard, the term "substantially limits" is to be construed broadly in favor of expansive coverage. *See* 29 C.F.R. § 1630.2(j)(1)(i); *see also id.* ("'substantially limits' is not meant to be a demanding standard"); *id.,* ¶ 1630.2(j)(ii). An impairment no longer needs "to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Id.,* ¶ 1630.2(j)(ii). "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id.,* ¶ 1630.2(j)(iii).

The CCSO argues that the inquiry under *Brumfield* is distinct from the inquiry that applies to determine whether a person has a qualifying "disability" under the ADA. *See* R. 57 at 4 ("While it is possible for a person to have a 'disability' under the ADA through the application of the ADAAA and §12102(4)(E)(i), the person must still also be 'otherwise qualified' to establish a failure-to-accommodate claim."). The Court agrees that the Seventh Circuit in *Brumfield* appeared to

impose a distinct requirement for a plaintiff to state a valid failure to accommodate claim.[19] But the Court disagrees that an interpretation of *Brumfield* can be applied that would allow a party to circumvent Congress's intent to broaden the scope of the ADA when it passed the ADAAA. Essentially, the CCSO is seeking to impose the old definition of "disability" without having to confront the legal issue of whether Luckett has shown he is disabled. That this is true is shown by the fact that, in addition to *Sheahan* and *Hooper*, the CCSO also cites to *Demetorpoulos v. Derynda Foods, Inc.,* 2010 WL 2900342 (E.D. Wis. July 20, 2010), and *Gray v. Keystone Steel & Wire Co.,* 2010 WL 1849803 (C.D. Ill. May 7, 2010), both of which rested on the definition of disability. Thus, it appears, the CCSO argues that the question of disability is a separate issue that is irrelevant to this case only when it is distinguishing Luckett's legal authority but not when it comes to the authority on which it relies. Both *Demetorpoulos* and *Gray* applied the pre-Amendment version of the statute to find that a plaintiff was not disabled when he or she was able to work through his or her discomfort. These holdings no longer are convincing after the Amendments, the impact of which is to make the "focus of th[e] court's inquiry" on "what a plaintiff confronts, not overcomes." *Cato v. First Fed. Cmty. Bank,* 668 F. Supp. 2d 933, 942 (E.D. Tex. 2009) (citing *Emory v. AstraZeneca Pharm., LP*, 401 F.3d 174, 181 (3d Cir. 2005)).[20] To avoid contradicting the new standards for

---

[19] The Court has been unable to find case law from any other circuit applying a similar rule to that found in *Brumfield*.

[20] *Demetorpoulos* and *Gray* also are distinguishable because the plaintiff in those cases, like the plaintiff in *Sheahan*, claimed a physical disability, not a mental disorder like PTSD. The only mental disorder cases the CCSO cites are *Brumfield*

disability effected by the ADAAA, the limitation on the term "qualified" imposed by *Brumfield* should be similarly focused.

Applying the *Brumfield* rule here in a manner that is consistent with the standard for finding a disability under the ADAAA also makes sense in light of the rationale for *Brumfield,* which was intended to address the situation where an employee has a condition that meets the statute's definition of a disability but the major life activity affected by the disability has "no causal connection" with the accommodation sought. *Brumfield*, 735 F.3d at 633 (citing *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 785 (7th Cir. 2007) (citing *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005) (holding that an employer need not accommodate an employee's back injuries simply because they substantially limited the

---

and *Hooper,* which the Court has already found to be distinguishable, and neither of which, in any case, considered whether the 2008 Amendments might affect the proper analysis of the *Brumfield* issue of whether the plaintiff can perform the essential functions of his job even without an accommodation. The Court's own search for cases involving either PTSD or a similar mental disorder turned up several cases holding that the plaintiff was not entitled to an accommodation. *See, e.g., Colón v. Ill. Bell Tel. Co.*, 2009 WL 3147008, at *4 (N.D**.** Ill. Sept. 28, 2009) ("[The plaintiff] has provided no evidence that his PTSD diagnosis has made him generally incapable of working. Indeed, the accommodation he requests—a less stressful job—belies his own argument, for it shows that he can work—just not in the particular job he currently has. The ADA provides no protection in this situation."); *see also Walker v. U.S. Sec. of The Air Force*, 7 F. Supp. 3d 438, 452-54 (D.N.J. 2014) (finding that, while plaintiff, a civilian air force employee, had cognitive difficulties, he did not have substantial limitations where he suffered a traumatic brain injury resulting in decreased memory, language dysfunction, and mental fatigue); *Martinsky v. City of Bridgeport*, 814 F. Supp. 2d 130, 141-45 (D. Conn. 2011) (holding that former police officer's panic disorder did not substantially limit either his non-working life activities, or his major life activity of working). But the conduct at issue in all of those cases occurred prior to 2009 and hence the courts were applying the stricter ADA disability standard that no longer applies.

employee's ability to engage in sexual relations))). The CCSO does not argue (nor could it) that Luckett's PTSD lacks a causal connection with the accommodation he seeks. Luckett has testified (R. 49 at 69 (¶ 38)) that continuing to work in Division 11 where there is a low officer-to-inmate ratio has greatly exacerbated his PTSD. *See Garcia-Hicks v. Vocational Rehab. Admin.*, 148 F. Supp. 3d 157, 167 (D.P.R. 2015) (addressing plaintiff's contention that her pain was exacerbated by sitting); *Sturz,* 642 F. Supp. 2d at 888 ("plaintiff has adduced evidence that she needed the accommodations to reduce stress on her joints and that not having the accommodations exacerbated her conditions"). Moreover, the fact that Luckett's PTSD did not, at least initially, prevent him from performing his job "is not determinative, as a disability can be 'episodic' if it 'substantially limits a major life activity when active.'" *Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 995 (W.D. Tex. 2012). The Court also notes that less than one year after Luckett filed the present lawsuit, on or about April 22, 2015, Luckett was alone, working in Division 11 and supervising 48 inmates when he suffered a second inmate attack. R. 58 at 5 (¶ 19).[21] Luckett went on another leave for duty injury after the second inmate attack, and remained on leave at least up through the date on which he filed his affidavit in support of his opposition to the CCSO's summary judgment motion. *See* R. 58 at 5 (¶ 19). Neither party has addressed the implications of the second inmate

---

[21] Luckett's interrogatory responses refer to a "February 2011 inmate attack." R. 31-1 at 169. The Court does not know what to make of that reference, given that the record contains evidence of only two inmate attacks, one of which occurred in September 2012 and the other in April 2015.

attack on Luckett's accommodation claim, but logically it would seem to have some bearing on that issue.

Finally, the CCSO states that Luckett "is a correctional officer, which necessitates working with detainees." R. 57 at 5. This comment seems *in apropos* because the CCSO has eschewed the one argument it could have made that might have some merit. That is, the CCSO could have, but has not, argued that an essential function of the job of a correctional officer is to supervise inmates, and that supervising inmates frequently requires contact with unrestrained inmates. And it is well established law that if an employee seeks an accommodation that avoids an essential job function, then that employee is not a qualified individual entitled to an accommodation. *See Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir. 1996) (where the plaintiff was unable to perform the essential functions of her position, and no accommodation would allow her to do so, she is not a "qualified individual with a disability" entitled to the protections of the ADA); *see also Stevens*, 851 F.3d at 230 ("A reasonable accommodation can never involve the elimination of an essential function of a job.") (internal quotation marks and citation omitted).

This legal principle is explained in detail in *Basith*, where the Seventh Circuit found that Cook County had a valid reason for determining that delivery of medication to patients was an essential function of a Pharmacy Technician II. 241 F.3d at 929 (upholding the denial of an accommodation to the plaintiff whose physical limitations prevented him from performing the delivery function of his job, even if that function was only a limited part of his job, stating that "Cook County's

valid reason for treating delivery as an essential function—the needs of the pharmacy's patients—renders the limited time devoted to delivery irrelevant").[22] The Seventh Circuit stated the general rule that,

> if an employer has a legitimate reason for specifying multiple duties for a particular job classification, duties the occupant of the position is expected to rotate through, a disabled employee will not be qualified for the position unless he can perform enough of these duties to enable a judgment that he can perform its essential duties.

*Id.* Significantly, the *Basith* court cited *Miller v. Illinois Department of Corrections*, 107 F.3d 483 (7th Cir. 1997), as an example of this principle, wherein the court held that a blind correctional officer who could not stand guard or count inmates was not qualified under the ADA, even though she could perform other essential functions. *Id.* at 485. The *Miller* court found that the duties of standing guard and counting inmates "were essential functions because the prison had a valid reason (the prevention of riots) for requiring all of its guards to be able to perform them." *Basith*, 241 F.3d at 929.

> In the case of correctional officers and other paramilitary and military personnel, the reason for having multiply able workers who rotate through the different duty positions is to be able to respond to unexpected surges in the demand for particular abilities. The prison has to be able to call upon its full staff of correctional officers for help in putting down a prison riot, and therefore each officer must have experience in the positions, such as searching and escorting inmates, that provide the

---

[22] *See also Stevens,* 851 F.3d at 929 (employer of pharmacist was entitled to make the administration of immunizations an essential function of the job of pharmacist such that it was *not* a "reasonable accommodation" to require the employer to excuse the plaintiff from administering immunizations even though he suffered from trypanophobis (fear of needles)).

necessary training and experience for responding effectively to a riot, as well as the capability for such response. It would not do to have a correctional officer whose only experience and capability were in operating a telephone switchboard or issuing weapons.

*Miller,* 107 F.3d at 485.[23]

Instead of making this argument, the CCSO argues only that Luckett in fact can perform the essential job function of supervising unrestrained inmates. It would seem that the CCSO has made a conscious decision *not* to argue that Luckett is unqualified if, as he says, he cannot perform the job of supervising unrestrained inmates. For this reason, the Court will not make that legal argument for the CCSO. *See Gross*, 619 F.3d at 704. The Court also cannot say on the current record whether that argument would be successful here, for there would need to be evidence to support it. *See, e.g., Price v. City of N.Y.*, 264 Fed. App'x 66, 68 (2d Cir. 2008) (where the plaintiff identified six permanently disabled employees who were allowed to remain employed); *Russell v. City of N.Y.*, 2006 WL 2333728 (E.D.N.Y. 2006) ("If as a matter of practice the NYPD employs police officers in permanent

---

[23] *See also Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997) (holding that, "[e]ven assuming that an Alpharetta police detective spends a relatively small amount of time performing the type of field work that Holbrook concedes he cannot undertake, the record establishes—and Holbrook has not proven to the contrary—that the collection of all evidence at the scene of the crime is an essential function"); *Martinsky,* 814 F. Supp. 2d at 146-47 ("To refute the Defendant[']s assertion that the patrol duty is an essential function, Plaintiff argues that officers are regularly assigned to long-term positions not involving a patrol function. However, . . . Plaintiff's evidence, taken as true, would merely indicate that officers are sometimes placed in short-and long-term positions that do not involve patrol functions, but Plaintiff has not provided evidence to suggest that such placements are permanent such that the BPD has allowed an employee to maintain a position within the Department who could not perform a patrol function if required to do so.").

non-patrol positions, this would refute defendants' assertion that patrol or firearm duty is an essential function of the job."). While the CCSO indicates that it has a policy and practice of placing employees in "transitional work assignments," which are of limited duration and for which Luckett purportedly did not qualify because of the indefinite nature of his request for reassignment, that does not necessarily mean that the only option was a "transitional work assignment," *i.e.,* that the CCSO has never placed a correctional officer in a permanent position with limited-to-no inmate contact. Neither party has presented any argument or evidence on these issues, and therefore they must remain undecided, even though they appear to be the crux of the matter before the Court. Based on the matters on which the CCSO did present argument and evidence, the Court finds that a disputed issue of fact exists over whether Luckett can perform the essential functions of his current assignment in Division 11 of the CCDOC without a reasonable accommodation, and thus denies the CCSO's motion for summary judgment on that issue.

### 2. WHETHER THE CCSO FAILED TO REASONABLY ACCOMMODATE LUCKETT'S DISABILITY.

Having found that the CCSO is not entitled to summary judgment on the issue of whether Luckett is a qualified individual with a disability, the question then becomes whether the CCSO (1) was aware of Luckett's disability; and (2) failed to reasonably accommodate it. *Brumfield,* 735 F.3d at 631 (citing *EEOC v. Sears Roebuck & Co.,* 417 F.3d 789 (7th Cir. 2005)). The CCSO does not dispute that it was aware of Luckett's medical diagnoses of PTSD from his treating physicians. The

CCSO argues, however, that it did not fail to reasonably accommodate Luckett for several reasons.

### (a) MEDICAL DOCUMENTATION ISSUE

The CCSO's primary argument is that it did not fail to reasonably accommodate Luckett because Luckett failed to provide adequate medical documentation of his disability. This issue turns to a large degree on whether the factfinder believes Luckett's testimony that he delivered the medical notes of his treating neurologist and psychiatrist to Rivero-Canchola or the latter's testimony that she only received the initial doctor's note from Luckett's treating internist, and thus summary judgment in favor of the CCSO would be inappropriate.

Moreover, even if Rivero-Canchola did not receive the additional medical documentation in question, as Luckett points out, the law requires the CCSO to engage in a dialogue with Luckett regarding Luckett's request for an accommodation for his PTSD. *See Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014); *Sears, Roebuck & Co.,* 417 F.3d at 806; *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). In determining the appropriate reasonable accommodation, an employer has the burden to "initiate an informal, interactive process with the qualified individual with a disability in need of accommodation." *Lenkiewicz v. Castro*, 146 F. Supp. 3d 46, 51 (D.D.C. 2015) (internal quotation marks and citation omitted). "Relatedly, [a]n employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation." *Id.* (internal quotation

marks and citations omitted). Indeed, "when the duty to reasonably accommodate arises, both employee and employer must exchange essential information and neither side can delay or obstruct the process." *Id.* (citations and internal quotation marks omitted).

Rivero-Canchola initially engaged in the interactive process by exchanging emails with Luckett over what was required for the CCSO to consider Luckett's accommodation request. But the interactive process appears to have broken down at some point, which can be fairly pin-pointed as the point when Rivero-Canchola, by her own testimony, "discovered" the "conflicting IMEs" in Luckett's record. A reasonable juror could conclude based on the evidence that Rivero-Canchola decided either by herself or in conjunction with other decision-makers within the CCSO, that Luckett's PTSD was not real. Rather than discuss their concerns with Luckett and/or his treating physicians who had diagnosed him with PTSD as well as psychological issues related to his Moyamoya disease, they chose to remain silent. A reasonable jury could decide that the CCSO then used the excuse of lack of medical documentation as a basis to deny Luckett's accommodation request to avoid engaging with Luckett on the real basis for its decision, which was not the *lack of medical documentation* but the CCSO's *disbelief* of that medical documentation.

Luckett uses the term "pretext" in arguing that the CCSO's reason for denying his accommodation request was disingenuous. The Seventh Circuit, however, has said that the issue of pretext, which is pertinent to claims of disparate treatment, is "unnecessary and inappropriate" in reasonable accommodation claims.

*Lenker v. Methodist Hosp.*, 210 F.3d 792, 799 (7th Cir. 2000). Nevertheless, what Luckett calls "pretext" is evidence of a break-down in the interactive process that a reasonable fact-finder might attribute to the CCSO. The CCSO may very well have a valid reason for denying an accommodation request based on conflicting medical evidence, but that question is not before the Court for decision. Assuming without deciding that such a denial might be reasonable under certain circumstances, it is not acceptable for the employer to make such a decision behind closed doors and without giving the employee the opportunity to address the employer's concerns about the employee's supported medical diagnoses.

In short, the Court does not need to decide what standards would apply to a situation where there is medical evidence in the record to support both sides' position leading to a good faith dispute over whether the employee is in need of an accommodation. Here, it is enough that the evidence supports Luckett's argument that the CCSO never gave him the opportunity to have a dialogue with it on that issue. As a result, a reasonable jury could conclude that there was a failure by the CCSO to participate in good faith in the interactive process. Evidence of this failure includes (1) Rivero-Canchola's admission that the conflicting IME may have been the reason for her decision to deny Luckett's accommodation request when the IME was never mentioned to Luckett, who was told instead that the reason for the denial was a "lack of medical documentation"; (2) the CCSO's changing explanations for

why it required Luckett to provide a doctor's note "releasing" him back to work;[24] and (3) the explanation the CCSO now gives for rejecting Luckett's medical note from Dr. Legrand—that, as an internist, he was not qualified to opine that Luckett had PTSD—when there is no indication in the record that the CCSO every communicated its concerns about Dr. Legrand's qualifications to Luckett.[25]

The Seventh Circuit has noted that "[n]o hard and fast rule will suffice" for attributing blame for the breakdown of the interactive process. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996). "Rather, courts should look for

---

[24] Rivero-Canchola's email to Luckett at the time explained that Luckett's IME had only released Luckett back to work for the injuries he sustained from the inmate attack but had not released him to work for his pre-existing conditions stemming from his Moyamoya disease. Cutting through the double-speak, this explanation means that the CCSO made a mistake by ordering Luckett back to work when his IME (for whatever reason) had not released him to work, and that Rivero-Canchola wanted Luckett to correct that mistake by providing a doctor's note to retroactively support the CCSO's decision to order him back to work. The CCSO gives a different explanation now, arguing that Rivero-Canchola requested that Luckett provide a doctor's note releasing him back to work because it is standard procedure to do so whenever an employee seeks an accommodation even when the employee is working at the time because the employee has indicated by making the accommodation request that he is unable to perform his job. *See* R. 35 at 9 (¶ 49).

[25] The CCSO's written accommodation policy only requires medical documentation that comes from an employee's "treating physician." R. 49 at 38 (¶ 44). Neither Rivero-Canchola, nor anyone at the CCSO ever communicated to Luckett that Dr. Legrand was not qualified to provide documentation to support his accommodation request. *Id.* According to Luckett, when he submitted Dr. Legrand's letter to Rivero-Canchola in June 2014, she read the letter in his presence, and stated "this is fine." R. 49 at 65 (¶ 4). She did not ask for more information at that time, nor did she ever make any inquiry into Dr. Legrand's credentials before making a determination that he was not qualified to support Luckett's accommodation request. Dr. Legrand's letter states that the CCSO should contact him if it had any questions about his letter. The record contains no evidence that the CCSO ever did that, despite Rivero-Canchola's testimony that she had concluded that Dr. Legrand lacked the necessary qualifications to opine on Luckett's medical condition.

signs of failure to participate in good faith." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 862 (7th Cir. 2015). The Court concludes that disputed issues of fact exist on whether the CCSO failed to participate in the interactive process in good faith, and therefore the Court cannot rule as a matter of law that the CCSO's denial of Luckett's accommodation request was reasonable.

### (b)    THE CCSO'S OTHER ARGUMENTS

In addition to its medical documentation argument, the CCSO also makes three other arguments for why it did not fail to reasonably accommodate Luckett's accommodation request. First, the CCSO repeats its previously mentioned argument that the law does not require an employer to provide medical treatment for an employee's disability. While this is a valid argument to make in opposing a failure to accommodate claim, Luckett does not base *his* failure to accommodate claim on the denial of psychiatric treatment. Luckett's argument is that the CCSO failed to accommodate his disability by rejecting his request for a work assignment with little to no inmate contact. While the CCSO may be correct that requiring an employer to provide medical treatment is never a reasonable accommodation request (an issue the Court need not decide), it is undeniable that a reassignment, under the right circumstances, may be a reasonable accommodation request to make. *See* 42 U.S.C. § 12111(9)(B) ("The term 'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules, *reassignment to a vacant position* . . . .") (emphasis added).

Second, the CCSO argues that Luckett was not qualified for a transitional work assignment because a transitional assignment cannot exceed six months and Luckett sought an assignment for an undetermined length of time. *See* R. 34 at 6-7. Whether Luckett qualified for a transitional work assignment, however, involves disputed issues of fact. But more importantly, the CCSO is trying to force Luckett into the "transitional work assignment" box when Luckett simply sought an accommodation, whether that be a transitional work assignment or something else.[26] Moreover, the CCSO had a duty to engage in the interactive process with Luckett and could not reject his accommodation request merely because he may have used the term "transitional work assignment" and was not qualified to receive one. There is no indication in the record that Rivero-Canchola ever had a discussion with Luckett regarding what would be a reasonable accommodation for his PTSD. The CCSO simply denied his request by letter stating it was not supported by medical documentation. While Luckett was not necessarily entitled to the exact accommodation he sought, the CCSO did not discuss any alternatives with him. For this reason alone, a reasonable jury could conclude that the CCSO violated its duty under the ADA of providing a reasonable accommodation.

---

[26] While Luckett referenced a "transitional work assignment" at various points in time as part of his accommodation request, he testified that he did not understand the technical definition given to that term by the CCSO and that he was using the term more generically to refer to any change in assignment that would accommodate his PTSD by allowing him to work in a position with little to no inmate contact. That Luckett requested not just a "transitional work assignment" but an "accommodation" in general is supported by the documentation in the record of Luckett's accommodation requests.

Finally, the CCSO argues that there is no evidence that a vacancy for a position with little to no inmate contact existed at the time Luckett made his request for an accommodation.[27] While Luckett ultimately bears the burden of proof on this issue, the Court cannot say that he has failed to create a disputed issue of fact on the subject. Luckett's past work history suggests that a transfer to another division in the facility was at least a possibility. Moreover, Rivero-Canchola's emails to Mark Robinson and Mary McQuillan suggest that a reassignment to a different division with little-to-no inmate contact would have occurred had Rivero-Canchola not decided to deny Luckett's accommodation request based on the IMEs she discovered after contacting Robinson and McQuillan. There is no evidence in the record to suggest that, at any relevant point in the process by which Luckett sought an accommodation, the CCSO believed or informed Luckett that a transfer to a division with a lower officer-to-inmate ratio would not be possible because of the lack of openings. Had that been the case, one would expect the CCSO to have communicated with Luckett on that subject, and there is no evidence that it did. Accordingly, the Court cannot say that Luckett is precluded from presenting his failure to accommodate claim to a jury based on the absence of evidence regarding the availability of a vacant position to which he could have been reassigned.

---

[27] The only case cited by the CCSO in its opening brief on this issue, *see* R. 34 at 7, does not support the CCSO's argument that the plaintiff must show that a vacancy existed at the time of the request for a job transfer as an accommodation. While the CCSO cites additional case law in its reply brief which does support that argument (*see* R. 57 at 6), an argument that is not raised in the proper manner until the reply brief usually will be deemed waived. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). Nevertheless, the Court will address the argument.

**CONCLUSION**

For the forgoing reasons, the CCSO's motion for summary judgment, R. 33, is granted as to Counts I and III and denied as to Count II.

IT IS SO ORDERED

Thomas M. Durkin
United States District Judge

Dated: August 7, 2017